## BLUEFIELD WATERWORKS & IMP. CO. v. SANDERS.

(Circuit Court of Appeals, Fourth Circuit.    October 2, 1894.)

### No. 79.

1. BOUNDARY—COUNTY LINE—EVIDENCE.

Acts Va. 1845, pp. 37, 38, provide that the surveyors of the counties out of which any new county shall be formed, together with the surveyor of such new county, shall act as commissioners for running and marking the boundary lines designated in the act creating such county; that said lines, when so run and marked, shall be the dividing lines between such counties; that the commissioners shall report their doings, accompanied by a plat showing courses, distances, streams, etc., to the county court of each county interested therein; and that such "plat" shall be "conclusive evidence in all controversies" which may arise touching said lines. *Held*, that a plat made pursuant to such statute of the line between Mercer county, on one side, and Giles and Tazewell counties, Va., on the other, and which is now part of the line between the states of Virginia and West Virginia, is in all cases conclusive evidence of the location of such line, however crooked or erroneous it may be, and of the location, with regard to such line, of a natural object shown by such plat.

2. COURTS—JURISDICTION—RESIDENCE OF DEFENDANTS—PROCESS.

In an action in Virginia against a corporation of West Virginia, and other nonresidents, to enjoin the diversion of waters of a stream, it appeared that defendants were laying pipes and constructing waterworks on ground most of which plaintiff conceded, and all of which defendants claimed, to be in West Virginia; and that process was served on defendants on a few feet only of such ground which plaintiff claimed to be in Virginia. *Held*, that the court would hesitate to violate the privilege a citizen has of being sued in the jurisdiction of his residence, and would earnestly scrutinize the steps taken in the institution of an action against a defendant unwittingly in its jurisdiction.

Appeal from the Circuit Court of the United States for the Western District of Virginia.

This was a bill by Walter M. Sanders against the Bluefield Waterworks & Improvement Company and others to enjoin the diversion or appropriation of the waters of a natural stream. There was a decree for complainant (58 Fed. 133), and defendant company appeals.    Reversed.

This is a bill in equity brought by a riparian owner of lands watered by a stream in Tazewell county, Va., to enjoin the use of water from a spring out of which the stream flowed into and through the lands of the plaintiff, in diminution of the natural supply of water in the stream in quantity to which the plaintiff claimed to be entitled. The appellant is a corporation chartered by the legislature of West Virginia, and resident at the incorporated city of Bluefield, Mercer county, in that state. This is a rapidly growing city, now possessing 1,500 inhabitants. The appellant company was endowed by Bluefield with a franchise and right to construct and maintain works for supplying the city, its inhabitants, and property holders with water for domestic and manufacturing purposes. Three tracks of the Norfolk & Western Railroad converge at Bluefield, where the railroad company has important works. This company depends upon the appellant corporation for the water it requires for its engines and works at Bluefield. The charter of the appellant company authorizes it, among other things, to erect and operate waterworks, to supply persons and corporations with water, to build and lease houses, and to acquire and hold such lands and property, and such rights and interests therein, as may be necessary and useful to its purposes. Under its powers thus derived, the appellant company purchased sundry properties containing springs of water in the vicinity of Bluefield, and also purchased, at a large price, one acre of land two or more miles from

Bluefield from one Carmack Baily, a citizen of Tazewell county, Va., which adjoins the county of Mercer. This acre of land contained a very bold, prolific spring, called the "Beaver Pond Spring." Having contracted with the city of Bluefield to supply it with water for all purposes, and with the Norfolk & Western Railroad Company to furnish it with a full supply of water for its engines and works at Bluefield, the appellant company, by pipes and machinery, had availed itself of the full use of the several springs of which it had become owner, other than the Beaver Pond spring, and was, when the present litigation began, laying pipes from Bluefield towards this spring, and erecting machinery and suitable buildings on the acre of land purchased from Baily, with the view of availing itself of the water of that more prolific spring. While thus engaged, the appellee in this suit, Walter M. Sanders, a citizen of Tazewell county, Va., and owner of some 3,000 acres of land in that county lying below the Beaver Pond spring, and watered by Beaver Pond creek, which flowed from the spring, presented a bill of injunction to the judge of the circuit court of Tazewell county, praying, among other things, that the appellant company and four citizens, who were named, and supposed to be its agents, be made parties defendant, and that the appellant and the persons named, and its agents and servants generally, be enjoined from taking any water from the spring or from the stream flowing out of it, and from diverting the water or the flow of the water from its natural course. The judge of the circuit court of Tazewell county granted the injunction prayed for, by an order restraining, until the further order of the court, the appellant and its agents from interfering with and from diverting or in any manner appropriating the water from the said spring, whether in the spring or in the natural bed flow of its water, except so far as the water might be necessary for the domestic use of persons and live stock living and grazing on the acre of land containing the spring, and especially restraining appellant from diverting or appropriating the water, by means of pipes or other appliances, from the spring and its outflowing stream.

It is to be observed that Beaver Pond spring is very near the boundary line between Virginia and West Virginia, which is also the boundary line between Tazewell county, Va., and Mercer county, W. Va. Local opinion was divided upon the question whether the spring was within Tazewell or Mercer county, within Virginia or West Virginia. If the spring was in West Virginia, then the laying of pipes between Bluefield and the spring, and the erection of buildings and machinery at the spring, were beyond the jurisdiction of an injunction issuing from the judge of the circuit of Tazewell county, Va., until the process provided by law for bringing nonresidents into court had been resorted to. The bill of injunction assumed, however, contrary to public opinion in Bluefield and Mercer county, and contrary to the belief of the appellant company and its agents, that the Beaver Pond spring was in Tazewell county, Va.; and the process under the bill was issued and served on that theory. Summons was issued from the office of the clerk of the Tazewell circuit court against the appellant company, described as a corporation of West Virginia, and against the four persons named in the bill,— Lowder, A. Tackett, H. Tackett, and Crouch. The summons was addressed to the sheriff of Tazewell county, and this summons, on which was indorsed the restraining order of the judge, which has been mentioned, was placed in the hands of his deputy. The return filed by the deputy on these papers was as follows: "I executed the within summons on the defendant T. J. Crouch on the 4th day of June, 1892, by delivering to him an office copy of said summons. On the 8th day of June, 1892, I executed this summons on L. C. Tabb, an agent of Bluefield Waterworks and Improvement Company, whom I found on the premises, overseeing the work mentioned in the indorsement on this writ of injunction. On the same day, to wit, on the 8th June, 1892, I executed this summons on the following persons, to wit: Hill, an engineer of the defendant company; Graves and Bige Lowder, engaged on said work,— to all of whom I gave an office copy of the within summons." A like summons and indorsement were delivered to the sergeant of the city of Roanoke, Va., the return on which was as follows: "Executed June 10, 1892, by delivering a copy of this writ to M. W. Bryan, treasurer of Bluefield Waterworks and Improvement Company, in the city of Roanoke, where he resides, the

president of the said company not being found in my bailiwick." In addition to the mesne and special process just described, complainant below, the appellee here, made publication once a week for four weeks in a newspaper published at Tazewell Courthouse, Va., under a law of the state relating to suits against nonresidents, in which the bill of injunction under consideration was described, the parties to the suit named, and its object set forth. No affidavit, however, was attached to this publication, as required by law. The appellant company and its agents proceeded with the pipe laying and other work in which they had been engaged when the papers from the Virginia clerk's office were served upon them, but did nothing in violation of the Virginia judge's order restraining them from "interfering with and diverting or in any manner appropriating the water from the Beaver Pond spring." Nevertheless, proceedings were at once begun against them for contempt. Upon affidavits filed charging them with acts committed in violation of the restraining order that had been served upon them, and with contempt of court, the judge of the Tazewell circuit court issued an order requiring the appellant and its agents, who were named, to appear before him to show cause why they should not be attached and punished for their contempt. Copies of this order to show cause were delivered to the attorney of the defendants by a deputy of the sheriff of Tazewell county, and also to some half dozen persons supposed to be agents of the appellant company. None of the returns made by the deputies of the Tazewell sheriff, either upon the original process or the subsequent order to show cause, state that the service was made within the county of Tazewell, Va. Thus required by punitive process, the appellant company made a special appearance before the judge of the circuit court of Tazewell county, and filed a special answer, confined exclusively to the matter of contempt, in which it denied the contempt, and supported its denial by affidavits of several witnesses cognizant of the facts of the case. The judge before whom this special appearance was made promptly entered an order recognizing, in terms, that the appearance had been special, and summarily dismissing the contempt proceeding. A few weeks afterwards, the appellant company and the four persons mentioned as codefendants in the original bill filed a petition in the circuit court of Tazewell county praying for a removal of the cause into the circuit court of the United States for the western district of Virginia, sitting at Abingdon. The petition was granted, and the cause removed into the federal court. On the 22d of October, 1892, the appellant company filed a motion in that court, parts of which are here given: "The Bluefield Waterworks and Improvement Company, one of the defendants to the bill of complaint of the plaintiff [Walter M. Sanders], appears in this cause for the sole purpose of objecting to the process issued in this cause against said defendant, and to move the court to quash and abate the same, for the following reasons: (1) The circuit court of Tazewell county had no jurisdiction to entertain this suit, and no process could legally issue thereon. (2) Said court had no jurisdiction of the subject-matter of the suit. (3) Said court had no jurisdiction over the said defendant, it being a corporation chartered by the state of West Virginia, and doing business exclusively in said state of West Virginia, and owning no land, estate, or debts in the state of Virginia. (4) Because the suit is not a proceeding in rem. It does not seek to recover any land, or interest in any land, owned by the defendant in the state of Virginia; nor does it seek to subject to the claim of the plaintiff any estate or debt owing to said defendant situate in the state of Virginia." Other reasons are stated for quashing the process issued in the cause, which need not be detailed here. On the same day on which this motion to quash was made, to wit, on the 22d October, 1892, the court overruled the motion. On the next day, the appellant company and the other defendants in the original bill filed a demurrer to the bill. The first ground of the demurrer was that the circuit court of Tazewell county had no jurisdiction of the cause, either of the persons of the defendants or the subject-matter of the suit. The second ground of objection related to the want of proper parties to the cause. The court overruled the demurrer. Thereupon, and not until after all these proceedings were had, the defendants in the original suit, having no other recourse, filed their answer to the bill, and made defense on the merits of the controversy. After the usual course of pro-

ceeding, the court below entered a final decree perpetuating the injunction originally granted, and denying to the appellant company the use of the Beaver Pond spring for supplying the city of Bluefield and the Norfolk & Western Railroad Company with its waters, from which decree appeal was taken to this court.

During the progress of the suit in the court below, an order was entered by that court directing W. M. Dunlap, a civil engineer, to run and ascertain the line (of boundary) between the county of Mercer in the state of West Virginia and the county of Tazewell, in the state of Virginia, as run and marked by Robert Hall, late surveyor of Mercer county, Kiah Harman, late surveyor of Tazewell county, and William Hale, late surveyor of Giles county, as shown by the report and plat of said late surveyors, filed in the year 1848. This order was executed by the engineer designated, and a report and plat of a line were filed by him, and are made part of the record in this suit. Apropos of this order of court looking to the running of a boundary line for these counties by a civil engineer, the following facts must needs be stated: In the year 1848, the county of Mercer having some time before been formed from the territory of Giles and Tazewell counties, the three surveyors who are mentioned in the order of the court just mentioned were appointed, in accordance with the laws of Virginia, to run and mark and make plat of the boundary lines between the new county of Mercer and the other two counties. This was 16 years before West Virginia was cut off from Virginia, carrying Mercer county with it. These three surveyors, acting as joint commissioners, made in due time report of the work they had performed, accompanied by a plat of the boundary lines which they had run and marked. Their tripartite report and plat were filed in each of the three counties, were accepted by the courts of the counties, and became, by force of law, the authoritative markings of the boundary lines to which they related.

A general law of Virginia was then, and is still, in force (Acts Assem. 1845, pp. 37, 38), which, among other things, declares as follows: "The surveyor or surveyors of the county or counties out of which any new county shall hereafter be formed, together with the surveyor of such new county, shall be, and they are hereby, appointed commissioners for running and marking the boundary lines designated in the act creating such county. * * * The said lines, when so run and marked by them, shall be taken and held as the dividing lines between the said counties. It shall be the duty of the said commissioners to report their proceedings and doings in the matter, accompanied by a plat showing the courses and distances, and the streams and other natural and artificial objects or points referred to in the act aforesaid, to the county court of each county interested therein, to be recorded in their respective offices," etc. "And the said plat shall be conclusive evidence in all controversies which may arise touching said lines."

On the formation of the state of West Virginia, in which Mercer county was embraced, and in which the counties of Giles and Tazewell were not included, the lines run and marked by the three surveyors, Hall, Harman, and Hale, as laid down on the plat and report which they made and filed, showing the boundary line between Mercer county, on one side, and Giles and Tazewell counties, on the other, became incontrovertibly the boundary line between Virginia and West Virginia.

The facts which have been above recited seem to be all that are necessary to the decision of this appeal. The grounds of the decision which will be rendered in the cause will now be stated.

A. W. Reynolds, for appellant.

S. C. Graham, for appellee.

Before GOFF and SIMONTON, Circuit Judges, and HUGHES, District Judge.

HUGHES, District Judge. The question which presented itself at the threshold of this litigation was the vital one whether the circuit court of Tazewell county had jurisdiction of the suit, and especially of the defendants to the bill of complaint that was ex-

hibited in the cause. The defendants were nonresidents of the county of Tazewell and of the state of Virginia. They were residents of the adjoining county of Mercer, in the state of West Virginia, and citizens of that state. The original motion against them was made ex parte, and without notice. The process served on them was issued out of the office of the clerk of Tazewell county, and was served by a deputy of the sheriff of that county. It was served, as they believed and contended, on the territory of West Virginia, and beyond the limits of Tazewell county and of Virginia. They deny their liability to be sued in Virginia for the cause of action mentioned in the bill of injunction originating this suit. They deny the validity of the process which was issued against them, and which it was their first act in the suit to move to quash. They deny the validity of the service which was made upon them of this process. At every stage of the suit below, they made constant protest against the jurisdiction of the courts before whom they were brought to entertain jurisdiction against them in a state and county in which they were not residents.

It is a high privilege of the citizen of the United States to be sued in the jurisdiction in which he resides, in personal actions. He may, by his own act, waive this privilege. He may enter into a contract, or do an act, in another jurisdiction, which, if it constitute a cause of action against him, will render him liable to be sued where the cause of action arose, if he go voluntarily there, and process be served upon him while there. In special cases, if he own lands or property or choses in action in another jurisdiction, and be under obligation to a citizen there, he may be sued there in respect to that property on that obligation, whether he go there or not; but in such cases the manner of notifying him of the suit and bringing him into court is carefully defined by statute, the provisions of which are required to be strictly and fully complied with. If a nonresident be unwittingly in a jurisdiction in which he is nonresident, and be served with process while ignorantly and unintentionally there, the courts will severely scrutinize the process itself and the circumstances under which it was issued and served in contravention of his natural right to be sued at home. Applicable to such a case is the remark of the chief justice of the United States in Fitzgerald & Mallory Const. Co. v. Fitzgerald, 137 U. S. 105, 11 Sup. Ct. 36:

"If a person is induced by false representations [he might have added "by erroneous belief"] to come within the jurisdiction of a court, for the purpose of obtaining service of a process upon him, and process is there served, it is such an abuse that the court will, on motion, set the process aside."

Of course, this remark applies to nonresident corporations as fully as to natural persons. In the same case as the one quoted, the chief justice said:

"Nor are we impressed with the tenability of plaintiff's position in relation to the service [of process] in any view. Where a foreign corporation is not doing business in a state, and the president or any officer is not there transacting business for the corporation, and representing it in the state, it cannot be said that the corporation is within the state, so that service can be made upon it."

In the case at bar, a corporation of West Virginia was laying pipes and constructing waterworks on ground most of which was concededly in West Virginia, and all of which the corporation and its agents believed to be so. Only a few feet of this ground were claimed by the plaintiff to be in Virginia, and this claim was denied by the appellant company and its agents. But, on the chance that some of the agents of the company might be caught on this diminutive space of territory when process should be served upon them, and on the contention that, if any work were done on this small area by the agents of the appellant company, it would bring the company within the meaning of the law of Virginia permitting corporations "doing business" in Virginia to be sued in the courts of the state, the appellee brought this suit in the Virginia court, instead of doing so in West Virginia. Certainly will the law, under circumstances like these, hesitate to violate the privilege which the citizen has of being sued in the jurisdiction of his residence, and be disposed to look with earnest scrutiny into the steps taken in the institution of a suit invading this privilege.

Sections 3225–3227 of the Code of Virginia relate to the manner in which suits may be commenced against corporations, defining the officers or persons on whom mesne process may be served in various circumstances and contingencies and the manner of service. Whatever may have been the contention of appellee's counsel in the court below in respect to the bearing of these sections upon the service of the process which was made in this suit, they now declare, in the brief presented to this court, that "these sections have not the slightest application to this case." Whatever may have been the contention in the court below of the same counsel as to the effect in this case of the order of publication set out at page 10 of the record, they now declare in the brief filed in this court, that "it is not a legal process." The mesne process which was taken out by appellee in this suit, and the service which was made of it, is valid, therefore, if valid at all, only by virtue of sections 1104 and 1105 of the Code of Virginia. Section 1104 requires every incorporated company doing business in the state to have an office within the state for the transaction of all its business; and, if it be a company incorporated by another state, to have also an agent in this state empowered to receive service in suits and to enter appearances for it in courts. Section 1105 declares that the "officers, agents, and employees of any such company doing business in this state without complying with the provisions of the preceding section, shall be personally liable to any resident of the state having a claim against the company, and, moreover, service of process upon either of said officers, agents, or employees, shall be deemed a sufficient service on the company." Our inquiry, therefore, in this case, is limited to two questions, namely, whether the service of process which was made upon the persons of sundry agents of the appellant company as shown by the record was made in the county of Tazewell, and whether the appellant company was "doing business" in the state of Virginia. The return of the deputy sheriff of Tazewell county shows expressly as to some of

the persons served and impliedly as to all, that the process was served on them "on the premises of the appellant company." If these "premises," therefore, were not in Tazewell county, the process was not legally served; and we are, in that case, relegated to the inquiry whether the premises were in Virginia or West Virginia. We have the same question to deal with in the inquiry whether the appellant company was "doing business" in Virginia, which is only another form of the question whether the "premises" on which it was operating were in Virginia or West Virginia.

An inspection of the plat of the three surveyors, Hall, Harman, and Hale, which has been described above in the statement of the facts of this case, shows that the Beaver Pond spring is laid down on it as one of the "natural objects" which they were required by law to mark and designate on the plat. It is also obvious from the plat that this spring is laid down on it as upon the Mercer side of the boundary line between Mercer and Tazewell counties; that is to say, as upon the West Virginia side of the boundary line between Virginia and West Virginia. If, therefore, in the language of the act of 1845, the plat of the three county surveyors be "conclusive in all controversies which may arise touching said line," then the question is closed. Under the law, this court and all courts are bound to hold that the Beaver Pond spring is in Mercer county and in West Virginia, and that any line run by any other person or persons than the surveyors of those counties throwing this spring into Virginia is illegal and spurious as to that spring. The court below, however,—that is to say, the circuit court of the United States for the western district of Virginia,—treated the plat as inconclusive, and early in the litigation under consideration made the decree which has been mentioned, directing W. M. Dunlap, a civil engineer, to run and ascertain the line between the counties of Tazewell and Mercer as run and marked by the three surveyors, Hall, Harman, and Hale, but directed it to be run "as shown by the report and plat of said late surveyors." This engineer proceeded to act under the decree. Under the language of that mandate, he was charged simply with the task of processioning the line already run and marked by the three surveyors. He failed to do this. He mistook his errand. His report shows that he found the line which had been run and marked by the original surveyors to be more or less crooked, and that he ran a line himself as a substitute for and improvement on the original one. He discarded the devious, swerving line of the original surveyors, and made and reported a different and scientific one of his own running and marking. The language of his report shows that he misconceived the meaning and object of the decree under which he was acting, and that, in making a new line, he did the very thing which the court did not and could not order to be done. The law of the land made the line of Hall, Harman, and Hale, however crooked, the true line, and the plat marking and mapping it, with sundry adjacent natural objects, conclusive of its location, and of the location of the natural objects laid down upon it, the Beaver Pond spring among others. With interesting naïveté, Mr. Dunlap declares that he found this

official line to be an awkward job of work. He therefore under-
took to substitute in lieu of it another line, more satisfactory and
comely, and strictly straight and scientific. The language of his
report on this subject is now given, the italics not being his.
Beaver Pond spring lies in the space between East River mountain
and Peery's milldam.    The engineer says:

"A large flag was placed at the corner on East River mountain, high above
the trees, and a *straight line* was accurately run from Peery's milldam to it. Along
this line were found numerous *line trees*, marked as described in the report of the
three surveyors, and which are shown on the plat. It will be observed that the
marked *line trees* were not exactly on this *straight line* [made by himself] joining
the two corners, which may readily be accounted for from the fact that the ap-
pliances and methods used then were inferior to the present instruments and
practice.   In fact, it would be impossible to run a *straight line* over such ground,
seven miles long, with an ordinary surveyor's compass, depending entirely upon
the magnetic needle; and this long *line of marked trees* is about as most of the old
lines through hilly, wooded country are found to be." (He meant to say, "is
about as crooked as most of the lines of the old surveyors are found to be.")

In the fact that, pursuing the old line marked by the numerous
line trees mentioned by Mr. Dunlap, and laid down on the old plat,
there is found to exist a different line from the new, straight one
run by this engineer with modern instruments, we have an explana-
tion of the circumstance that the Beaver Pond spring is by the old
plat in Mercer, and by the new plat in Tazewell, county.

The law declares that the plats made by the county surveyors, two
or more in number, shall be conclusive in all controversies relating to
them,—conclusive, not only as to the lines, but as to the natural
objects laid down upon them.    Mr. Dunlap's line is more scientific
than the swerving line, seven miles long, which it was "impossible"
for the three old surveyors to make straight; but it is the line of
science, and not the line of the law.    The line of the law must
prevail, even though, by swerving a greater or less number of rods,
poles, or perches from a scientific course, it left the Beaver Pond
spring in West Virginia.    All the surveys of county boundaries and
private lands made in the centuries of our colonial and national
history, including three-fourths of the present century, were made
by surveyor's compass, Jacob's staff, and theodolite. The old sur-
veyors possessed no long-visioned telescopes.    They groped their
way through forests, depending alone on the magnetic needle for
their courses.    In the language of Mr. Dunlap, it was "impossible"
to make their lines straight with these imperfect instrumentalities.
All their lines were more or less devious and rambling.    But, such
as they were, in order to prevent infinite disputes and ceaseless
litigation, the law made the lines thus run by official surveyors, and
the plats describing them by natural objects, "conclusive" evidence
in all controversies relating to them.    These lines are fixed and es-
tablished, and cannot be changed.    If now the scientific skill of
modern engineers, and the highly-improved instruments now used
by them, were applied to these old lines; if bright flags hoisted high
above the tops of the trees on lofty mountain tops, and telescopes
with range of 7 or 70 or 170 miles, were employed to straighten
out the existing boundary lines of states, counties, and farms,—a

universal babel of protest would be raised throughout the land against the injustice, the innovation, and the impertinence.

In the eye of the law, and by force of law, this Beaver Pond spring is in West Virginia; and the service made by the officers of Tazewell county upon agents "on the premises" of the appellant company was null and void. This company, in laying pipes in Mercer county leading from Bluefield to this spring, and in erecting buildings and placing machinery at the Beaver Pond spring, was not "doing business" in the state of Virginia, and was not amenable to the provisions of section 1105 of the Code of Virginia, authorizing the process to be served on any of its agents. It is plain, therefore, that the court below erred in disregarding the rule of evidence prescribed by the Virginia act of assembly of February 14, 1845; in treating the plat of Hall, Harman, and Hale as inconclusive; in allowing any line to be run by a civil engineer other than that of the three surveyors; in accepting the report and plat of that engineer, laying down a different line between East River mountain and Peery's milldam in lieu of the line and plat already established by law; and in accepting this engineer's line as proving that the Beaver Pond spring was in Tazewell county, Va., and rejecting the line and plat of the three surveyors, which placed this spring in Mercer county, W. Va. In the course of political events, this line, formerly of counties only, has become the boundary line between two states; and it is incompetent for any court, in a suit between private persons, by the appointment of an engineer or otherwise, to change that line for any purpose, whether to affect the rights of citizens, or to enlarge or diminish the territorial jurisdiction of courts, or to augment the domain of one state at the expense of another state.

The decree of the court below, from which this appeal is taken, must therefore be reversed for want of jurisdiction, and the suit dismissed, but without prejudice to the plaintiff below in any suit which he may institute in a court of competent jurisdiction to enforce any rights he may have as riparian owner of lands lying upon the stream supplied from the Beaver Pond spring, which has been the chief subject of the present litigation.